I respectfully dissent in part from the majority's disposition of assignments of error I, II, and V. I II I concur with the majority's opinion that the court should have granted a directed verdict or judgment notwithstanding the verdict (JNOV) in favor of AICI on the breach of contract claim. However, I disagree with the majority's conclusion that AICI may not be held liable for bad faith by virtue of the fact AICI did not breach its contractual guaranty duty to the plaintiffs. The tort of bad faith for breach of an insurer's obligation was first recognized by a court of last resort in Gruenberg v. Aetna Insurance Company (1973),9 Cal.3d 566. The Supreme Court of California recognized a cause of action in tort as a means of avoiding the harshness of the common law of contract, finding that the obligation of an insurer to deal fairly and in good faith with its insureds is a duty imposed by law, the breach of which is a tort. Id. at 574. Ohio recognized the tort of bad faith in Hoskins v. Aetna Life Insurance Company (1983), 6 Ohio St.3d 272. Currently, the tort is defined by Zoppo v. Homestead Insurance Company (1994), 71 Ohio St.3d 552, syllabus 1, cert. denied (1995), 516 U.S. 809, providing that an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish a reasonable justification therefore. The Ohio Supreme Court has never squarely addressed the issue of whether an insurer may be liable for the tort of bad faith in the absence of a breach of the express terms of the insurance contract. In Motorists Mutual Insurance Company v. Said (1992),63 Ohio St.3d 690,694-695, overruled on other grounds by Zoppo, supra, the court held that the tort of bad faith is not a tortious breach of contract, but rather arises as a consequence of the breach of a duty established by a particular contractual relationship. The Court of Appeals for Montgomery County has interpreted this language to mean that a cause of action for the tort of bad faith may exist irrespective of any liability arising from a breach of contract, does not necessarily rely on a breach of contract claim for its existence, and may in certain circumstances be brought as a separate cause of action. Bullet Trucking, Inc. v. Glenn Falls Insurance Company (1992), 84 Ohio App.3d 327, 333. The Franklin County Court of Appeals has disagreed with the Bullet Trucking case, concluding that Ohio law does not support the proposition that an insured may maintain an action for failure to investigate where he did not establish an entitlement to coverage under the policy. Pasco v. State Automobile Insurance Company (December 21, 1999), Franklin Appellate No. 99AP430, unreported. I would conclude that a review of the policy interests underlying the existence of the tort of bad faith, and a review of cases from other states, requires a conclusion that under Ohio law, a tort action may, in certain circumstances, exist in the absence of a breach of the express terms of the contract. The public interest in insurance contracts, the nature of insurance contracts, and the inequity in bargaining power between the insurer and the policy holder all serve to distinguish insurance contracts from other types of contracts. Best Place, Inc. v. Penn America Insurance Company (1996), 82 Haw. 120, 131. A tort action for breach of a covenant implied in a certain type of contractual relationship is more likely to be recognized where the contract is one from which the plaintiff seeks something more than a mere commercial advantage from the defendant. Id. In an insurance contract, the policy holder typically seeks the peace of mind and security which arises from the purchase of protection against calamity. See Egan v. Mutual of Omaha Insurance Company (1979), 24 Cal.3d 809, 817, cert. denied (1980), 445 U.S. 912. Insurance companies use the concept of selling peace of mind in the manner in which they market insurance contracts. Even a cursory viewing of television exposes the viewer to commercials for the sale of insurance, indicating that the purchaser will be "in good hands," that he has a "piece of the rock," or the insurer will be there "like a good neighbor." Farris v. U.S. Fidelity and Guaranty Company (1978), 284 Or. 453, 479 (Lent, dissenting). The application of a bad-faith tort is necessary because of the relationship between the parties, and the fact that in the insurance field, the insured typically has no voice in preparation of the policy. McEvoy v. Group Health Cooperative of Eau Claire (1997), 213 Wis.2d 507, 521-522. Furthermore, there generally is a great disparity between the economic positions of the parties to a contract of insurance, and at the time an insured party makes a claim, he may be in dire financial straits, and be especially vulnerable to oppressive tactics. Id. All of the arguments cited above to justify the existence of a tort action in bad faith are particularly applicable to a heath insurance contract. In the climate of today's medical economy with the high cost of medical treatment, an adverse benefits ruling means not just that the insurance company will not provide payment, but that medical care itself is effectively denied. Id., at 521. Prior to managed care, coverage was tangential to the delivery of health care. W. Sage, Judicial Opinions Involving Health Insurance Coverage, 31 Ind. L. Rev. 49, 52 (1998). Disputes arose long after treatment was rendered, and focused on payment rather than survival. Id. Healthcare policy makers did not connect coverage litigation with issues of cost, access to medical care, and quality of medical care. Id. at 53. As medical costs have risen and managed care organizations have combined financing with delivery of care, the relationship between the denial of coverage and the ability to receive care has become clearer. Thus, several states have recognized a tort action independent of a breach of contract action, and concluded that an insurer may be liable for breach of the duty of good faith even if the insurer did not breach any of the express terms of its contract with the insured. For example, in concluding that breach of an express covenant in an insurance policy is not a prerequisite to bad-faith claim, the Supreme Court of Arizona found that the implied covenant of good faith may be breached, whether the carrier pays the claim or not, when its conduct damages the very security which the insured sought to gain by buying insurance. Deese v. State Farm Automobile Insurance Company (1992),172 Ariz. 504, 507-508. South Carolina has similarly concluded that the benefits due an insured are not limited solely by those expressly set out in contract, and an insurer may therefore be liable for bad faith even if the insurer has not breached a contractual provision. Tadlock Painting Company v. Maryland Casualty Company (1996), 322 S.C. 498. In distinguishing a tortious breach of contract from the tort of bad faith, the Supreme Court of Hawaii concluded that the tort of bad faith allows an insured to recover even if the insurer performs the express covenant of the contract. Best Place, supra, at 131. See also Robinson v. North Carolina Farm Bureau Insurance Company (1987), 86 N.C. App. 44, 49-50
(nothing in case law requires that the tortious conduct be accompanied by a breach of the contract, as an insurance company is expected to deal fairly and in good faith with policy holders). I would therefore conclude that an action in tort for bad faith is not dependent on a breach of contract action, but rather a bad faith claim may be established if the facts demonstrate that the insurer has failed to deal fairly with the insured. The issue thus becomes whether the contractual relationship and course of dealing between the parties is sufficient to allow the trial court to submit the issue to the jury of whether AICI breached a duty of good faith, or whether the court should have directed a verdict for AICI. I would hold that bad faith claims are necessarily decided on a case-by-case basis, and a trial court must analyze the evidence of involvement of the party defendant to determine if the action survives directed verdict. In the instant case, based on AICI's involvement, I would find that the court did not err in submitting the claim to the jury. AICI is the parent corporation of Community Insurance Company, dba Anthem Blue Cross and Blue Shield. The Certificate of Membership and Summary of Benefits, signed by Ben Lytle as CEO of AICI, and attached to the certificate of insurance provided to appellees, includes the guaranty language cited by the majority, providing that AICI would pay in the event Community becomes financially unable to satisfy its obligation to provide insurance. AICI's role as guarantor alone would not support a claim against them. However, this certificate goes onto state: As long as the Guaranty Policy is in effect, you will be a member of Associated entitled to all rights of membership in Associated accorded to members of a mutual insurance company under the Indiana Insurance Law, including the right to one vote on all matters that come before the members of an Indiana domestic mutual insurance company under the Indiana Insurance Law and equity rights in the event of a liquidation, merger, consolidation or demutualization as provided in Associated's Article of Incorporation from time to time in effect. Such equity rights are intended to be equivalent to the rights which you would have as a member under an Associated policy if Associated rather than Community had issued the Community contract.
This language goes beyond a mere guaranty of payment in the event of Community's demise. This certificate creates a relationship between AICI and the policy holders of Anthem, giving the policy holders membership rights in AICI. Further, there is evidence that AICI was involved in decisions regarding the broad general medical policy of Anthem, and specifically involved in the decision regarding appellee's appeal, which affected the general medical policy of the company. As stated by Judge Frost in overruling appellant's motion for judgment notwithstanding the verdict: As was noted in the plaintiff's memorandum contra, the parent company controlled the conduct of its subsidiary by promulgating the medical policy upon which the basis of the denial of coverage was made, by processing the appeal of the denial of coverage and by the participation of its employees in the misconduct alleged herein. Additionally, this Court finds that the parent company was actively involved in the facts of this matter and did not sit back as a parent company overseeing the acts of the subsidiary. The defendant, Anthem Insurance Company, Inc., was not only directly and actively involved but all of the actions of the defendant Community Insurance Company, were undertaken pursuant to policies and procedures promulgated by the defendant, Anthem Insurance Company, Inc.
Judgment Entry, October 25, 1999 Although the court erroneously used the phrase "piercing the corporate veil," the evidence of AICI's involvement in the instant action supports a conclusion that a contractual relationship between the parties is implied through AICI's involvement in the appeals process. There was evidence that all medical policy was established by AICI, and that the medical policy unit makes decisions on appeals affecting medical policy. There was evidence that while the Cincinnati appeals office assembled the paperwork, such paperwork was then sent to AICI for processing of the appeal. In fact, the appeals coordinator had attempted to hand deliver Esther Dardinger's chart to the Indianapolis office in order to avoid the mail delay, but the chart was rejected for failure to include all the forms necessary for processing. There was evidence that Leeann Rossi, Appeals Processor for Anthem in Youngstown, prepared the final letter denying the appeal, but the actual decision on the appeal had been made by the medical policy unit, and she had no involvement other than signing the final letter as directed. In addition, except for the limited purpose of a motion for a directed verdict and judgment notwithstanding the verdict, the defendants represented themselves to the jury and the court as a single entity, "Anthem," represented by a single attorney. In both argument and testimony, there was no effort to distinguish between the corporate entities. Addressing a different but analogous issue, the Supreme Court of Wisconsin concluded that an HMO making an out-of-network benefit decision is an insurer, subject to potential liability for bad faith. McEvoy, supra, at 517. As a practical matter, HMO subscribers are similarly situated vis-a-vis their HMO as insurance policy holders are to a traditional insurance company. Id. at 520. Similarly, in the instant case, the appellees were situated in the same position with AICI as with Anthem. AICI was making policy decisions, both general and specific, which directly affected the medical care afforded to Esther Dardinger, with a complete inequality of bargaining power between the parties. Accordingly, under the particular facts and contractual relationship in the instant case, I would conclude that AICI was an insurer of appellees, subject to liability for the tort of bad faith for its actions in the handling of appellee's appeal. By injecting itself into the decision making process and de facto controlling a contract to which it is not a party, AICI has an implied obligation to deal in good faith, and cannot now avoid answering in tort for breach of this duty based on its actions. I would enter judgment dismissing AICI from the breach of contract action, but affirm the judgment finding the defendants jointly and severally liable for compensatory damages for the tort of bad faith. I would also affirm the decision to award punitive damages in the instant case, but sustain assignment of error VIII, relating to remittitur of the punitive damage award. A court has inherent authority to remit an excessive award, assuming it is not tainted by passion or prejudice, to an amount supported by the weight of the evidence. Wightman v. Consolidated Rail Corp. (1999), 86 Ohio St.3d 431, 444, cert. denied (2000), 529 U.S. 1012. Before a court may grant a remittitur, four requirements must be meet: (1) Unliquidated damages are assessed by a jury,
(2) The verdict is not influenced by passion or prejudice,
(3) The award is excessive, and
(4) The plaintiff agrees to a reduction in damages. Id.
In considering a remittitur, the court must keep in mind the twin goals of punitive damages: punishment and deterrence. Id. at 445. The U.S. Supreme Court has identified three guideposts which indicate that a punitive damage award is grossly excessive, so as not to give a person fair notice of the magnitude of a sanction which may be imposed: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between compensatory and punitive damages awarded in the case, and (3) the difference between the award and the civil or criminal sanctions that could be imposed for comparable misconduct. BMW v. Gore (1996),517 U.S. 559. In the instant case, I would conclude that the court abused its discretion in denying the motion for remittitur, as the punitive damage award of $49,000,000 bears no reasonable relationship to the compensatory damage award of $2,500,000. There is nothing in the record to suggest that the appellants could be subject to sanctions in the amount of $49,000,000 for their actions in this case. I would conclude that the award is excessive, and the court should have offered a remittitur to the plaintiffs in lieu of a new trial. V Finally, I dissent from the majority's conclusion in assignment of error V that the court abused its discretion in admitting evidence of executive's salaries. In considering punitive damages, the jury may consider what amount of money is necessary to send a message to the defendants, deterring future conduct. While the personal executive's salaries are only marginally relevant to this issue, the appellants have not demonstrated prejudice sufficient to require reversal from the admission of this evidence. Accordingly, I would overrule the fifth Assignment of Error in its entirety.
 ____________________ W. SCOTT GWIN, JUDGE